Joseph P. Marcelle and Anna Rose Marcelle v. Commissioner.
Marcelle v. Commissioner
Docket No. 52966.
United States Tax Court
T.C. Memo 1956-223; 1956 Tax Ct. Memo LEXIS 69; 15 T.C.M. (CCH) 1174; T.C.M. (RIA) 56223; September 28, 1956
*69 1. Certain income received by petitioners in the taxable years 1948, 1949, and 1950, held to be proceeds from the sale of stock rather than compensation for services and taxable as long-term capital gain rather than as ordinary income. 2. The amount of legal fees taxable to petitioner in 1949 determined. 3. The amount of deductions allowable to petitioners for the taxable years 1948, 1949, and 1950 for legal fees, club dues, auto expenses, auto repairs, auto depreciation, entertainment expense, traveling expense, gratuities and gifts, and petty cash expenses determined. 4. The respondent erred in determining that a part of the deficiencies for the taxable years 1948 and 1949 was due to negligence or intentional disregard of rules and regulations. Anthony A. Marcelle, Esq., 15 Park Row, New York, N. Y., Albert I. *70 Schmalholz, Esq., and Samuel Bader, Esq., for the petitioners. William G. O'Neill, Esq., and Emil Sebetic, Esq., for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion Respondent determined deficiencies in income tax and additions to income tax under section 293(a) of the Internal Revenue Code of 1939 for the calendar years 1948, 1949, and 1950 as follows: Year
Deficiency
Addition
1948
$7,664.96
$383.25
1949
6,664.36
333.22
1950
4,714.38
235.72
The issues are: (1) Whether petitioners derived ordinary income or realized a long-term capital gain from the sale of 25 shares of stock in the Eastern Electric Vending Machine Corporation on June 1, 1948; (2) whether petitioners failed to report legal fees of $150 in 1948 and $750 in 1949; (3) whether petitioners are entitled to any deductions in excess of the deductions allowed by respondent for legal fees, club dues, auto expenses, auto repairs, auto depreciation, entertainment expenses, traveling expenses, gratuities and gifts, and petty cash expenses for all 3 taxable years; and (4) whether any part of any of the deficiencies is due to negligence or intentional disregard of *71 rules and regulations. In their reply brief, petitioners concede that they failed to report legal fees of $150 in 1948. Findings of Fact 1. Petitioners [1] are husband and wife residing in Brooklyn, New York. The income tax returns for the taxable years involved herein were filed with the then collector of internal revenue for the first district of New York. Petitioner is an attorney-at-law, admitted to practice in the State of New York in 1931. From 1944 to 1951 he was collector of internal revenue for the first district of New York. The Eastern Electric Vending Machine Corporation, hereinafter sometimes referred to as Eastern was incorporated under the laws of the State of New Jersey on October 30, 1945. It was organized by petitioner and one Mario Caruso as a sales corporation to sell electric cigarette vending machines. It issued 50 shares of $100 par value common stock, which were the only shares issued and outstanding to and including June 1, 1948, in the names of the following persons: Joseph P. Marcelle
2 shares
Anna Rose Marcelle
23 shares
Mario Caruso
12 1/2 shares
Rosa V. Caruso (wife of
Mario)
12 1/2 shares
*72 Petitioners paid a total of $2,500 for their 25 shares. On November 1, 1945, Eastern held a meeting of the stockholders and elected each stockholder a director and elected officers as follows: Joseph P. Marcelle
President
Anna Rose Marcelle
Vice President
Mario Caruso
Secretary
Rosa V. Caruso
Assistant Secretary and
Assistant Treasurer
On January 6, 1947, Anthony M. Caruso was added as a director of Eastern. The minutes of the above meeting of the stockholders held on November 1, 1945, state that it was unanimously agreed that no stockholder would either sell, assign, transfer, pledge, or otherwise hypothecate his or her shares of stock in Eastern without first obtaining the written consent of all of the stockholders, except that if any stockholder desired to sell, written notice thereof shall be given to each of the other stockholders, and any of the stockholders may purchase such stock within 90 days "for the sum determined by the Accountant for the company to be the value of said shares of stock according to the books of said company." The minutes also stated that the books of the company shall not include any value for any goodwill as an asset *73 in determining the book value of the shares, and that upon the sale by any shareholder of his or her stock, he or she "shall immediately resign all offices" held by him or her in Eastern "and cancel all unexpired contracts either written or verbal" he or she may have with Eastern without any further liability to the company. C-Eight Laboratories, hereinafter sometimes referred to as "C-Eight" is a copartnership consisting of eight members, namely, Mario Caruso, Anna Caruso, Marie Caruso Parmiciano, Rosa V. Caruso, Teresa Caruso Teahan, Isabel Caruso Bottini, Anthony M. Caruso, and Josephine Caruso. C-Eight was the owner and manufacturer of a revolutionary electric cigarette vending machine. On November 1, 1945, C-Eight entered into an agreement with Eastern by virtue of which Eastern was designated as the exclusive general sales agent of the cigarette vending machine and its accessories throughout the United States and its possessions and in all foreign countries. The agreement was to terminate on January 1, 1947, with an option to Eastern to renew for a further term of 1 year. By an undated amendment, the agreement was extended to December 31, 1950. On July 1, 1947, the agreement, *74 as amended, was again amended so as to terminate on August 1, 1950, with an option to Eastern to renew the franchise for an additional term ending on April 1, 1957. Petitioner was also the general manager of Eastern and primarily responsible for sales. He had an oral employment contract with Eastern at a salary of $100 per week and a commission of $2 for each machine sold and delivered. On April 4, 1947, the board of directors of Eastern voted to increase petitioner's salary to $200 per week with a commission of $6 for each machine, retroactive to January 1, 1947. Also, on April 4, 1947, the board voted to pay Anna Rose Marcelle a salary of $100 per week retroactive to January 1, 1947. Prior thereto Anna's salary was $60 per week. The duration of employment of petitioners was not fixed nor was there any other writing evidencing such employment. On January 5, 1948, the board voted to extend such compensation arrangements for petitioners but with no fixed duration. In 1948, petitioners received total salaries and commissions from Eastern of $62,710.61, which they reported in their joint return for 1948 as ordinary income. The total volume of gross sales of Eastern from the time it *75 was organized until June 1, 1948, amounted to several million dollars. During the early part of 1948, petitioner and Mario Caruso quarreled over the operations of Eastern. Mario felt that petitioner was making too much money out of Eastern and had C-Eight slow down delivery of the machines sold by petitioner on behalf of Eastern. Petitioner became dissatisfied with such operations and offered either to buy the stock of Eastern held by the Carusos or to sell them the stock held by petitioners. The result of the quarrel was that on June 1, 1948, an agreement was entered into between petitioners as sellers and C-Eight as buyers for the sale of the 25 shares of common stock of Eastern then held by petitioners. The material provisions of this agreement are as follows: "WHEREAS, Sellers are the owners and holders of 50% of the common stock of Eastern * * * and Mario Caruso (or his nominees) is the owner and holder of the remaining 50% of said common stock; and "WHEREAS, Buyers, as the manufacturers of electric cigarette vending machines under patents owned by them, have entered into an exclusive sales agency agreement with Eastern; and "WHEREAS, Buyers desire to purchase the aforesaid *76 stock interest of Sellers in Eastern; "NOW THEREFORE, it is mutually agreed as follows: "1. Sellers agree to sell to Buyers and Buyers agree to purchase from Sellers, their aforesaid 50% stock interest in Eastern for the sum of $60,000., payable in 36 equal monthly installments of $1,666.66, commencing with July 1, 1948. * * *
"5. At the aforesaid closing, and in consideration thereof, Eastern shall pay to Joseph P. Marcelle and Annarose Marcelle all salaries and commissions due them to the time of such closing as shown upon the annexed statements to June 1, 1948, said salaries being at the rate of $200 weekly to Joseph P. Marcelle, and $100 weekly to Annarose Marcelle, and said commissions being at the rate of $6 per each machine sold and delivered; or machines ordered up to and including and prior to June 1, 1948, but delivered thereafter, Eastern shall pay commissions to Joseph P. Marcelle at the rate of $6 per each machine sold and delivered. This agreement shall constitute and be deemed a guaranty of payment by Buyers to Sellers of the payment of the aforesaid moneys or any other moneys due hereunder from Eastern to Sellers. * * *
"7. In addition to the foregoing *77 payments to be made by Buyers and Eastern to Sellers, Eastern shall pay to Sellers 50% of any and all net assets of Eastern, as of June 1, 1948, other than those already provided for herein. "8. Upon the closing hereof, Sellers shall resign as directors and officers of Eastern, and their present employment contracts with Eastern shall end." Pursuant to the above agreement, petitioners transferred their stock in Eastern to the sellers and severed all relations with the company. Eastern paid petitioners the sum of $8,919.02 in 1948 and C-Eight paid petitioners the sum of $60,000, of which $10,000 was paid in 1948, $20,000 in 1949, $20,000 in 1950, and $10,000 in 1951, a year not involved in these proceedings. In their returns for the years in question, petitioners did not report as income the $8,919.02 received from Eastern. They reported the sales price of their stock at $60,000 and the cost thereof at $5,000 instead of $2,500, and returned as long-term capital gain on the installment basis 50 per cent of the reported gross profit of $55,000, one-sixth in 1948 and one-third in each of the years 1949 and 1950. The respondent determined that petitioners sold their stock in Eastern *78 for $8,919.02 and should have reported a long-term capital gain thereon in 1948 of $3,209.51 as representing 50 per cent of the difference between such selling price as determined and the cost of the stock of $2,500. He further determined that instead of the long-term capital gains reported by petitioners in their returns, they received and should have reported as "ordinary income" $10,000 in 1948 and $20,000 in each of the years 1949 and 1950. 2. During the years in question, petitioner also carried on some activities as a lawyer in addition to his position as collector of internal revenue. He reported gross receipts from legal fees of $1,700 in 1948, $18,000 in 1949, and nothing in 1950. The respondent determined that additional fees of $150 should have been reported in 1948 and $750 additional in 1949. In 1949, petitioner received legal fees from three clients as follows: The Johnson Matter
$17,500
Estate of Moore
250
Diana Matter
1,000
Total Fees
$18,750
In the Estate of Moore, petitioner called in another attorney by the name of Emanuel Perlman to assist petitioner with the case. When the fee of $250 was received in 1949, petitioner endorsed the entire *79 check of $250 over to Perlman and retained no part of the fee for himself. In the joint return for 1949, petitioner did not report as income any part of the $250 fee but did take a deduction of $250 for the amount paid to Perlman. The respondent allowed the deduction but increased petitioner's gross income by $250. In the Diana Matter, petitioner collaborated with an attorney from New Jersey by the name of Samuel Voltaggio. When the fee of $1,000 was received in 1949, petitioner kept one-half of it for himself and paid the other half to Voltaggio. In the joint return for 1949, petitioner reported as gross income $500 as his one-half of the fee but also took a deduction of $250 of the $500 paid to Voltaggio. The respondent allowed the deduction of $250 but increased petitioner's gross income by the entire $500 paid to Voltaggio. 3. Certain deductions claimed by petitioners on their joint income tax returns for the taxable years 1948, 1949, and 1950, together with the amounts disallowed and allowed by respondent for such years, are as follows: Taxable Year 1948
Deduction
Claimed
Disallowed
Allowed
Legal fees paid
$ 55.00
$ 55.00
Club dues
696.45
348.22
$ 348.23
Auto expense and repairs
1,137.06
568.54
568.52 [2]
Auto depreciation
781.78
589.10
192.68
Entertainment expense
2,662.66
887.55
1,775.11
Traveling expense
850.00
700.00
150.00
Gratuities & Christmas gifts
425.00
425.00
Petty cash expense
900.00
900.00
Totals
$7,507.95
$4,473.41
$3,034.54
Taxable Year 1949
Legal fees paid
$ 500.00
$ 500.00
Club dues
1,015.50
$ 507.75
507.75
Auto expense and repairs
1,086.65
543.33
543.32 [3]
Auto depreciation
895.14
671.35
223.79
Entertainment expense
3,620.74
2,413.84
1,206.90
Gratuities & Christmas gifts
720.40
720.40
Petty cash expense
900.00
900.00
Totals
$8,738.43
$5,756.67
$2,981.76
Taxable Year 1950
Club dues
$1,047.50
$ 523.75
$ 523.75
Auto repairs
1,389.24
1,389.24
Auto expense
906.64
453.32
453.32 [4]
Auto depreciation
845.59
634.20
211.39
Entertainment expense
Traveling expense
2,063.08
1,363.08
700.00
Totals
$6,252.05
$4,363.59
$1,888.46
*80 In the joint return for 1950, petitioner explained the above-mentioned deduction for traveling expense of $2,063.08 as being "Traveling Expense in connection with War Loss claim, fee for which is payable in 1951." Petitioner had been hired to represent Mario Caruso in a claim for some $2,000,000 of war damages he sustained in his Italian factory in Naples. At that time Caruso was heavily indebted and if he did not realize something soon on his war claim there was danger of his being wiped out financially. Caruso still owed petitioner about $28,000 on the 1948 stock deal and petitioner would stand to lose if Caruso should fail. Petitioner went to Italy with the result that the war damage claim was settled for some $700,000 in cash. The amount of $2,063.08 represents a bill for petitioner's personal travel submitted by the Fugazy Travel Agency, which petitioner paid by check dated May 3, 1950. Petitioner made other expenditures while on his 6-week trip to Italy *81 in 1950 of about $3,000 for which no deduction has been claimed. Petitioner received a fee for his services in 1952 which he returned as income in that year. 4. Petitioner, as collector of internal revenue for the first district of New York, asked Herman Schmidt, the head of the income tax division of that office to prepare petitioners' joint returns for 1948, 1949, and 1950. Schmidt prepared the returns. Petitioner turned over to Schmidt all of his checks, correspondence, bills, vouchers, and everything that he had and told Schmidt "not to save me any money and not to embarrass me; that I could afford to pay the tax and to be sure that I paid every nickel that I was obliged to." Notwithstanding these instructions, there was omitted from the 1948 return the $8,919.02 received from Eastern in that year and the cost of the Eastern stock was taken at $5,000 instead of $2,500. Legal fees of $150 were omitted in 1948 and $500 in 1949. Also, interest income of $62.01 was omitted in 1948 and $125.16 of interest income was omitted in 1949. The stipulated facts are so found. Opinion ARUNDELL, Judge: [1.] The principal issue is whether the $60,000 paid to petitioners by C-Eight over *82 the 36-month period as provided in the agreement dated June 1, 1948 is taxable as ordinary income as determined by the respondent or as long-term capital gain as reported and as contended for by petitioners. The answer depends upon whether the $60,000 was given in payment for the Eastern stock which petitioners admittedly sold to C-Eight on June 1, 1948, or whether, in substance, it was paid to petitioners as compensation for their resignation as directors and officers of and the termination of their employment contracts with Eastern. We fail to see how it could be the latter. Petitioners were not employees of C-Eight but were employees of Eastern, a separate and distinct entity from C-Eight. Petitioners desired to sell their stock in Eastern and, in accordance with the minutes of the first meeting of the Eastern stockholders, they were bound to offer it first to the other stockholders, which they did. As a result of the offer, the agreement of June 1, 1948, was entered into between petitioners as sellers and C-Eight as buyers wherein it was plainly provided that "Sellers agree to sell to Buyers and Buyers agree to purchase from Sellers, their aforesaid 50% stock interest in Eastern *83 for the sum of $60,000, payable in 36 equal monthly installments of $1,666.66, commencing with July 1, 1948." Notwithstanding this plain provision of the June 1, 1948 contract, the respondent points to paragraphs 7 and 8 of the same contract, set out in our Findings, and to the minutes of the first meeting of the stockholders wherein it was agreed that if any stockholder desired to sell his stock the other stockholders could purchase such stock at book value, excluding any value for goodwill. In the deficiency notice the respondent determined that the transactions with the other stockholders of Eastern "with respect to which alleged long-term capital gains were reflected in your returns * * * resulted in ordinary income in the amounts of $10,000.00 in 1948, $20,000.00 in 1949, and $20,000.00 in 1950" and that the $8,919.02 received from Eastern represented "unreported gain on sale of 25 shares of stock" computed as follows: Sale
$8,919.02
Cost
2,500.00
Gain
6,419.02
Recognized (50%)
$3,209.51 No error has been assigned regarding the $8,919.02 received from Eastern. Since that part of the respondent's determination is not at issue, we express no opinion relative *84 to its merits and we leave that matter where it stands. We do think, however, that petitioners were correct in reporting the $60,000 as consideration for the sale of their Eastern stock. If the buyers wished to pay more than the book value of the stock, we know of no reason why they could not do so. The most valuable asset owned by Eastern was the exclusive franchise with C-Eight to sell the electric cigarette vending machines. Whether the value asscribed to this agreement would be goodwill value within the meaning of that term as used in the minutes of the first meeting of the stockholders of Eastern is a point worth noticing although it was not argued by the parties in their briefs. In any event, if the buyers had not agreed to pay petitioners $60,000 for their stock, there is evidence in the record that a third party by the name of C. A. Blake, who was engaged in the cigarette vending machine operating business in 11 western states, would definitely have been willing to purchase petitioners' Eastern stock at that price. We emphasize again that petitioners were employees of Eastern and not of C-Eight. It should also be noted that in the minutes of the first meeting of the stockholders *85 of Eastern it was provided that if any stockholder should later sell his or her shares in Eastern to any of the other stockholders, the selling stockholder should resign as a director and officer or employee of Eastern. In view of this provision it would seem that the matter in paragraph 8 of the June 1, 1948 contract, set out in our Findings, was, in effect, superfluous. In view of all the evidence, it is our opinion, and we so find, that the $60,000 in question was paid to petitioners as consideration for the sale of their stock in Eastern and that no part of such $60,000 was paid petitioners as compensation for their resignation as directors and officers of and the termination of their employment contracts with Eastern. S. Blechman & Sons, Inc. v. Commissioner (C.A. 2, 1956), 229 Fed. (2d) 925. Since the respondent has allowed petitioners the full return of the cost of their stock in connection with the receipt of the $8,919.02, we hold that under section 117 of the Internal Revenue Code of 1939, the entire consideration of $60,000 is long-term capital gain. The respondent does not question the right of petitioners to spread 50 per cent of such long-term capital gain *86 over the 3 taxable years in question in the proportion that the amount collected each year bears to the total consideration received. We hold that should be done. 2. Relative to the second issue, petitioner concedes that he received in 1949 the three fees totaling $18,750 set out in our Findings. He testified that the reason he reported only $18,000 was that he had endorsed the entire check of the $250 fee from the Estate of Moore over to Perlman and had paid $500Voltaggio of the $1,000 fee in the Diana Matter for the work these attorneys had done, and that he (petitioner) had not claimed any deduction for such fees paid to Perlman and Voltaggio. We are satisfied from the evidence and have so found as a fact that petitioner did claim and was allowed a deduction of $250 for the fee paid to Perlman and $250 of the $500 fee paid to Voltaggio. We are also satisfied from the evidence that petitioner did pay Voltaggio $500 of the $1,000 fee. We hold, therefore, that petitioner's taxable income should include only $500 of the $750 in question. 3. It would serve no useful purpose to discuss all of the evidence introduced relative to the third issue. Suffice it to say, we think the respondent *87 clearly erred in not allowing petitioner the full amount of the traveling expense claimed in the year 1950. We sustain his determination as to all of the other items involved under this issue. 4. The respondent's determination that a part of the deficiencies for the taxable years 1948 and 1949 was due to negligence or intentional disregard of rules and regulations under section 293 [5] of the Internal Revenue Code of 1939 is prima facie correct and the burden of proving otherwise is upon petitioners. Avery v. Commissioner (C.A. 5, 1927), 22 Fed. (2d) 6. We think petitioners have met this burden. We do not believe petitioners intended to disregard the respondent's rules and regulations. Neither do we think any part of the deficiencies for 1948 and 1949 was due to negligence. Petitioner's instructions to Schmidt, set out in our Findings, were very specific to the effect that he wanted the returns accurately prepared. Schmidt was the head of the income tax division of the New York office. We believe that the mistakes made by Schmidt were honest mistakes and that petitioners acted in good faith in accepting and signing the returns so prepared. Cf. Rhett W. Woody, 19 T.C. 350; *88 and R. E. Nelson, 19 T.C. 575. It may be noted in passing that there is no assignment of error as to the additions made for the year 1950. This was called to the petitioners' attention at the trial and it was suggested by the Court that petitioners "file in the next week an amendment to make that allegation with reference to the year 1950" but no amendment was filed. We therefore sustain the respondent in his application of section 293(a), supra, for the year 1950. See Rule 17 of this Court' s Rules of Practice, and M. C. Parrish & Co., 3 T.C. 119, 129, affd. on other issues (C.A. 5, 1945), 147 Fed. (2d) 284. *89 Decision will be entered under Rule 50. Footnotes
1. The singular term "petitioner" sometimes used herein refers only to petitioner Joseph P. Marcelle. Whenever the plural term is used, both husband and wife are included.↩
2. Of this amount, $284.26 was allowed as a deduction for contributions. ↩
3. Of this amount, $271.67 was allowed as a deduction for contributions. ↩
4. Of this amount, $226.66 was allowed as a deduction for contributions.↩
5. SEC. 293. ADDITIONS TO THE TAX IN CASE OF DEFICIENCY. (a) Negligence. - If any part of any deficiency is due to negligence, or intentional disregard of rules and regulations but without intent to defraud, 5 per centum of the total amount of the deficiency (in addition to such deficiency) shall be assessed, collected, and paid in the same manner as if it were a deficiency, except that the provisions of section 272(i), relating to the prorating of a deficiency, and of section 292, relating to interest on deficiencies, shall not be applicable.↩